Marshall, C. J.,
concurring. This cause comes from the Public Utilities Commission, and the city of Columbus seeks reversal of an order made by *80 the commission relative to rates to be charged by The Ohio State Telephone Company in the city of Columbus, Ohio. The order of the commission approves rates in excess of certain rates stipulated in a franchise granted by the city of Columbus to' The Columbus Citizens Telephone Company, in 1899, and the commission claims the right to fix a rate in excess of the provisions of said ordinance, by virtue of a reservation made by the commission in certain merger proceedings in the year 1914, wherein a number of telephone companies having plants in cities throughout the state of Ohio merged. their plants and their companies into one corporation then formed under Ohio laws under the name of The Ohio State Telephone Company.
The question presented by this' record is whether the municipality, in 1899, had the power to make a contract with the telephone company agreeing upon a rate for product and service for a period of twenty-five years.
On May 8, 1899, the city of Columbus passed an ordinance granting a franchise to The Columbus Citizens Telephone Company, which company was. not theretofore doing business in'the city of Columbus, authorizing and empowering the board of public works to enter into a contract with the company, and pursuant to the provisions of the ordinance the board of public works did, on the Sth day of June, 1899, enter into such contract. And on the 12th day of June, 1899, another ordinance was passed affirming the contract, in which ordinance the provisions of the contract were fully set out. The contract provided that the telephone company, *81 its successors and assigns, be granted the right and .privilege, for the period of twenty-five years from the taking effect of the contract and ordinance, to enter upon and use the streets and public ways of the city for the purpose of digging trenches and laying conduits therein, erecting poles, and placing wires and cables in said conduits and on said poles, and all other necessary things to enable the company to construct, maintain and operate a telephone exchange, toll lines, and fire-alarm system. One of the provisions of the contract was that the city required the telephone company to lay not exceeding five miles of trench in the business portion of the city, and, if thereafter deemed necessary, to require other trenches and underground work, stipulating that in such event the company would be entitled to certain increases in the minimum-rate provisions, as extensions were required by the city. It was further stipulated that for full copper metallic circuit connections the telephone company should be entitled to charge for residences a sum not exceeding $30 per year, and for business houses and offices a sum not exceeding $42 per year, within the corporate limits of the city, and that the rates charged patrons of the company under like circumstances should be uniform. The provision for increases of rates specifically provided that if the city should at any time after five years require the telephone company to place additional wires under ground the charges for rentals might be equitably increased, not exceeding $1 per month per telephone in excess of the original charges. The 13th subdivision of *82 the contract contained the following provision: “The said The Columbus Citizens Telephone Company hereby agrees to faithfully and completely, carry out and fulfill each and all of the obligations, conditions and requirements in said contract contained on its part to be kept, observed and performed.” The same provision appears in the second ordinance passed under date of June 5, 1899. Thereupon the company did construct its telephone exchange and system and did construct a conduit system in connection therewith. No complaint is made as to á full compliance by the telephone company of all the provisions of the franchise, except as to the increase in the rates, as hereinbefore stated, in excess of the established rates under the original contract.
On July 5, 1914, The Columbus Citizens Telephone Company and thirteen other companies, applied to the public utilities commission for an order approving a merger agreement, and, after hearing, the commission approved the merger and approved the rates theretofore established by each and all of the telephone companies respectively, including the franchise-rates established by the contract entered into in 1899 between the city of Columbus and The Columbus Citizens Telephone Company. The order of the commission upon this point was as follows: “Ordered, that the authority herein granted, and the consent and approval of the Commission herein given be, and the same aré hereby conditioned upon the provision that nothing in this order shall be held or construed to prevent, preclude or estop the' Commission * * * -of fixing and determining, at any *83 time in the future, rates, charges, tolls and rentals that may be charged by said consolidated company, at any or all of its exchanges, or by any constituent company, upon complaint of any party or person or upon the Commission’s own initiative,” etc.
The city of Columbus was not a party to the proceedings in which that order was made. Thereafter, the merger company, The Ohio State Telephone Company, continued to comply with the rate provisions of the franchise of 1899, until February 1, 1917, at which time a new sbhedule of rates was filed by it with the Public Utilities Commission, without any application having been previously made for a modification of the commission’s former order wherein the existing rates were required to be maintained. The new schedule demanded $54 per year for business telephones, with a cash discount of $3. Thereupon the city of Columbus brought suit in the court of common pleas of Franklin county to enjoin the collection of the excess rates. A demurrer to that petition was sustained and the case appealed to the court of appeals, where the decision of the court of common pleas was reversed, the court of appeals holding that the provisions of the franchise, were binding. That case has never been disposed of for the reason that an issue! of fact was made as to whether or not the-city of Columbus had ever required the telephone company to extend its underground system bey'ond the original five-mile limitation, and the case has lain dormant in that court, apparently pending a decision of the proceedings before the Public Utilities Commission. The case in the state court of *84 appeals is reported in City of Columbus v. Ohio State Telephone Co., 13 Ohio App., 232.
On February 12, 1918, the telephone company filed an application with the Public Utilities Commission seeking a modification of its merger rate-order of July, 1914, and pursuant to such application the commission, on June 3, 1918, made an order requiring an inventory and valuation of all the property used and useful of the telephone company. Pending final disposition of that matter the commission on November 26, 1919, made an emergency order, over the objection of the city of Columbus, fixing the rates of the company in the amounts requested, without hearing any evidence as to the cost of product and service. It is from this order that error proceedings are prosecuted in this court.
The application of the telephone company for confirmation of the new schedule of rates filed by it cofttains the following allegations:
“That by reason of the great increase in operating cost due to increased cost of materials, supplies and labor, and also due to the extended and enlarged service furnished by your petitioner to its subscribers and the public by reason of the greatly increased number of service lines and telephones installed and operated within the City of Columbus aforesaid, and the extension of telephone service necessarily incident to such increase, the rates, charges, tolls and rentals fixed by your Honorable Commission by its said order of July 23, 1914, are now and have been since a date prior to February 1, 1917, unreasonably low and grossly inadequate; that said rates are insufficient to and have not pro *85 duced sufficient income properly to maintain and operate the said telephone system in the City of Columbus; and that unless your petitioner shall be permitted to charge and collect said increased rates set forth in the schedule filed January 1, 1917, it will not only be unable adequately to discharge its obligation as a telephone company, both to its subscribers and the public, but it will continue to operate at an actual loss of large sums of money, and without any or adequate return on capital invested, and will be compelled to dissipate its capital in operating expense; and that the rates so fixed by order of your Honorable Commission of July 23, 1914, are now and have been since a date prior to February 1st, 1917, not only not compensatory, but in fact confiscatory.”
The issue raised in the various applications and proceedings was the jurisdiction of the commission to abrogate the rates in the franchise-contract. The grounds alleged, in brief, are as follows:
(1) That the statutes do not give the Public Utilities Commission authority to make such order ; (2) If such authority was given by the merger section of the code, such authority was exhausted by the order of 1914, when rates in conformity with the franchise-contract were endorsed by the merger order; (3) If any such authority was attempted to be given by statute, that such statute is in violation of Sections 4 and 5, Article XVIII of the Ohio Constitution, and Section 10, Article 1 of the Constitution of the United States.
The'difficulty in this case is to determine the line of cleavage between the rights, powers and duties of *86 many conflicting interests; to fix the limitations of municipalities on the one hand and telephone companies on the other; to determine where the powers of municipalities and the Public Utilities Commission, respectively, begin and leave off; to ascertain how far the commission may exercise its regulatory powers without coming in conflict with the constitutional inhibition against impairment of the obligation of contracts. It is also imperatively necessary to ascertain how far the legislature has proceeded under the power conferred upon it by Section 2, Article XIII of the Constitution, in authorizing the commission to regulate or terminate valid contracts theretofore entered into between municipalities aijd utilities. As a preliminary to the solution of these problems we should first inquire into the purpose underlying the creation of the commission, the evils existing or threatened, and the remedy sought.
It is stated in the Constitution that the commission shall be given such supervisory and regulatory powers over the business of corporations as may be prescribed by law. By virtue of the police power, the legislature undoubtedly had such power without constitutional warrant. A valid exercise of the power necessarily presupposes some abuses or irregularities on the part of corporations, contrary to the public welfare, calling for remedy. The statutes which have been enacted show that they are designed to supervise and regulate two very important matters in which the public are deeply interested, to-wit, rates and service. The commissiori, however, is not the only agency through which abuses *87 and irregularities may be corrected; extensive powers have been conferred upon the municipalities of the state, both by the constitution and by statute.
In this inquiry we are concerned only with the matter of rates. Surely it requires no argument to show that the purpose of regulating rates was to prevent exorbitant rates which would amount to extortion and profiteering on the part of public utilities, on the one hand, and to prevent inadequate rates, which would amount to confiscation on the part of the municipalities, on the other hand. It is no hardship upon the public to be required to pay a fair, remunerative rate,-and it is no injustice to the utility to be required to conform to a rate which will provide a fair return upon the capital invested. . V
The commission, clothed with power to supervise and regulate rates, stands as a barrier against an exorbitant rate on the one hand and an inadequate rate on the other, and promotes and fosters a policy of “live and let live.” It is designed to relieve the public against the tyranny of utilities, and to relieve utilities against the tyranny of municipalities.There can be no tyranny, however, when utilities and municipalities, dealing on even terms, enter into mutual covenants, and the question under consideration is whether under such circumstances the commission can logically or constitutionally exercise the power of regulation.
Many utilities in Ohio are entirely free from municipal supervision and regulation in the matter of rates, and as to such utilities the commission by virtue of Sections 535, 540, 541, 614-20, 614-23, *88 and perhaps other sections of the General Code, has poweV to determine and fix reasonable rates for product and service, and the orders of the commission are final unless found to be unreasonable and unlawful.
Again by virtue of Sections 3644, 3982 and 3983, General Code, municipalities have been given specific authority without the concurrence or consent of the utility to fix rates within their corporate limits for product and service of gas companies, water companies, electric light companies, gas light or cohe companies, and steam heat and hot water companies, and as to such utilities both the utilities and the people of the municipalities, by virtue of Section 614-44, have the right to complain of such rates to the commission, and the commission shall thereupon “fix the just and reasonable rate,” etc.
Again by virtue of Sections 9113, 9133, 9144, 3769, 3770, 3645, 3635, 3640 and 3642, General Code, municipalities have been given specific authority to fix rates for product and service of street and interurban companies, movable or rolling roads, wagons, carts, drays, public docks and ferries, without any provision having been made for complaint to the Public Utilities Commission or other state agency. In fact it is expressly provided by Section 614-47 that the commission act shall not apply.
It will be seen, therefore, that in the first class of cases above referred to, where municipal regulation is specifically authorized, .a review is provided, and that in the second class, although regulatory power is equally specific, no review is provided. No reason is perceived why such distinction is made, and yet *89 it is clear that the distinction exists. It shows, however, that the action of the legislature, the source of all supervisory and regulatory power, has not been logical, which is not surprising in view of the labyrinth of complications in which the subject is involved.
In all the foregoing cases of regulation by the commission and those where review is provided for municipal regulation, it will be found that the power has been given to fix the rate by compulsion and without obtaining or asking the consent either of the consuming public or the utility corporation, and a review is therefore vitally essential to prevent injustice and extortion.
The same reasoning does not however apply to Section 9197, General Code, pertaining to the requirement that telephone companies shall obtain municipal consent as a condition precedent to laying wires in underground conduits. There is nothing arbitrary or compulsory about this statute. The consent is a matter of mutual and voluntary contract, involving all the necessary elements of valid contracts, to-wit, parties, consideration and subject-matter. Such contracts are to be enforced in the same manner and construed according to the same principles as other commercial contracts, and are protected by the same constitutional guaranties against impairment of obligations. The contracts being mutually binding and enforceable, and the parties being subject to no disabilities, their solemn obligations are not logically, or constitutionally subject to review or termination at the hands of the state or any agency of the state.
*90 If it is said that Section 9197 does not specifically confer upon municipalities the clear and unmistakable power to fix a -rate, it cannot be denied that it has at least sanctioned the making of a contract. If the municipality has not been clothed with power to fix a rate in a compulsory manner it has been empowered to negotiate and execute a mutual and voluntary contract.
Where, as in the instant case, a contract has been entered into, without any fraud or imposition having been practiced, the parties being competent to make it and its terms being agreeable to both parties, where it has been faithfully observed for a period of eighteen years without question and has once been approved by the commission in an ex parte proceeding brought by the telephone company, and where no compulsion has been exercised at the time of its execution, but on the contrary full voluntary consent has been given and an agreement entered into to faithfully carry out all its terms, including rates, what reason is perceived for acceding to the request of the telephone company for a revision of rates?
The only reason urged by the telephone company is that the present rate is inadequate and unremu-nerative and does not afford a fair return upon the investment. Even if this is true it affords no ground for relief. The courts do not relieve parties from the losses of an improvident contract, which has been fairly .negotiated. The fact .that there has been an increase in cost of furnishing product or service is the good fortune of the city and a misfortune of the telephone company. This was not to be *91 expected, because as a rule new and improved methods and inventions tend to gradually decrease costs, and if that had happened in this case the telephone company would have been the beneficiary. It is the function of courts to interpret and enforce contracts as made by the parties, not to modify them to meet changed conditions. Rising and falling markets frequently bring financial ruin to business men, but the courts turn a deaf ear. Does anyone doubt that the same rule applies to the contract between the city of Columbus and The Ohio State Telephone Company, if otherwise valid?
It would seem that these propositions are so well settled that citation of authority should be unnecessary. The question has, however, been squarely met in the case of Columbus Railway, Power & Light Co. v. City of Columbus, 249 U. S., 399. In that case the railway company sought to enjoin a continued enforcement of street railway franchise-ordinances fixing rates. The ordinances were passed in 1901, for the term of twenty-five years, and were duly accepted by the railway company.. Under their provisions the railway company was required to issue and sell eight tickets for twenty-five cents and give universal transfers. The provisions as to fares charged were faithfully carried out until 1918, when the franchise was surrendered and the injunction suit brought. It was alleged in the bill that due to many causes therein stated the gross earnings for the year ending June 30, 1919, would fall short of paying expenses, depreciation and taxes by approximately $250,000, and that there would be no earnings from which to pay in *92 terest charges or to yield any return to the company on the value of its property; that the rates of fare prescribed by the terms and conditions of the ordinances were insufficient to enable it to maintain its railway in good order and repair and to perform its duty as a public utility. After clearly stating that the passage of the ordinances and their acceptance by the railway company constituted a binding contract, the court made the following statement, which appears on page 409 of the opinion:
“By these contracts, obligatory alike upon the City and the Company, the City granted the right to use the streets and the Company bound itself to furnish the contemplated service at the rates of fare fixed in the ordinances. We cannot agree with the contention of the appellant that these were permissive franchises, granted and accepted with the right upon the part of the Company to abandon the uses and purposes for which the franchises were granted because the rates fixed became unremunérative as alleged in the amended bill. The authority under which the City acted came from the State, and was granted by proper statutes passed for that purpose. The contracts were made between the City and the Company, and became mutually binding for the period named in the ordinances. This case does not involve the remedies which may be invoked against a street railway company which is or may become insolvent because of conditions arising since it entered into a given contract. The Company seeks now by its own action to terminate the contracts, still binding upon it by their terms as to rates of fare to be, charged, and seeks to have the aid of *93 a court of equity by enjoining the City from any further requirement of service under them.
“There is no showing that the contracts have become impossible of performance. Nor is there any allegation establishing the fact that taking the whole term together the contracts will be necessarily unprofitable.”
Again, on page 412 of the opinion, we find this statement:
“Unforeseen difficulties will not excuse performance. Where the parties have made no provision for a dispensation, the terms of the contract must prevail. United States v. Gleason, 175 U. S. 588, 602, and authorities cited; Carnegie Steel Co. v. United States, 240 U. S. 156, 164, 165. The latest utterance of this court upon the subject is found in Day v. United States, 245 U. S. 159, in which it was said: ‘One who makes a contract can never be absolutely certain that he will be able to perform it when the time comes, and the very essence of it is that he.takes the risk within the limits of his undertaking.’ ”
These authorities could be greatly multiplied, but it is not necessary to discuss others. The case above quoted is much stronger than the case at bar, because in that case the company was willing to surrender its franchises, while in the instant case the franchise and all its advantages are retained. .
We have so far proceeded upon the theory that the ordinance of 1899 was a valid contract, and it is well, at this point, to examine the soundness of this theory.
*94 It has become established by numerous decisions of this court that an ordinance adopted by the municipality and accepted by the company constitutes a contract and that the rights of the parties thereunder are to be determined by its terms. (State, ex rel. West, Attorney General, v. Cincinnati Gas Light & Coke Co., 18 Ohio St., 263; Circleville Light & Power Co. v. Buckeye Gas Co., 69 Ohio St., 259; City of Columbus v. Columbus Gas Co., 76 Ohio St., 309; East Ohio Gas Co. v. City of Akron, 81 Ohio St., 33; Interurban Ry. & Terminal Co. v. City of Cincinnati, 93 Ohio St., 108; City of Cincinnati v. Public Utilities Commission, 98 Ohio St., 320, and Interurban Ry. & Terminal Co. v. Public Utilities Commission, 98 Ohio St., 287.) It has also been established by the supreme court of the United States in the case of City of Cleveland v. Cleveland City Ry. Co., 194 U. S., 517.
All of the foregoing cases assume that the municipality had the power to make the contract, and since this is denied in the instant case that question must receive attention.
The city of Columbus has of course inherent and common-law power to make contracts generally, but it does not follow that by virtue of the .consent provisions of Section 9197, General Code, it has power to stipulate a rate as a condition to the consent, and this must be our next inquiry, and we will first -discuss the matter upon principle, without regard to precedent.
The right to contract generally, and the discretion to give or withhold consent, are not identical propositions, but they have much in- common, The *95 consent to the use of the streets being discretionary and optional with the city, it may give such consent without imposing conditions of any kind, or it may adopt the opposite extreme and refuse consent altogether. Between these two extremes there is a middle course in which the consent may be given subject to the utmost detail of conditions.
Where the utility has no franchise to use the streets and alleys and can only acquire the right to such use by consent, the granting of the consent is not a mere formality which the utility may demand as of right, but on the contrary the city lawmakers have certain business functions to perform, among which is the duty to use judgment and discretion in imposing reasonable and proper conditions to the grant. These conditions may assume a great variety of forms. The lawmakers might require the payment of a lump sum of money; they might forego any money consideration and impose very exacting conditions as to care, repair, maintenance and restoration of streets, and indemnity against loss, damage and liability; they might take the view that the utility is so beneficial and so necessary to. the welfare and development of the city that it would be wiser to make no charge and impose no burdensome conditions, thereby making it possible for the utility to operate cheaply, on condition that a favorable rate be made to the citizens for product and service. Any of these conditions or stipulations would constitute a valid consideration for the use of the streets, and any of them would be such a consideration as would accrue to all citizens even though *96 not all of the citizens should contract for and use the service.
It has been urged that a stipulation for a favorable rate would not be a proper consideration for a consent to a telephone company because a large percentage of citizens do not directly employ the service. The same is true of every utility, yet it does not follow that because they are not directly benefited they may not be benefited indirectly. Telephones have become a public necessity, or at least a very great convenience which benefits every member of society, as well those who have their own phones as those who use their neighbors’. Business places conduct business better and more economically. A high telephone rate tends to increase the general living cost and a lower rate tends to reduce it.
The very name “utility” indicates general public use and necessity and it is only on that theory that the police power is invoked and state supervision and regulation exercised. The claim that a stipulation for a maximum rate for service cannot be made a part of the consideration for the consent is not justified. The consent is purely discretionary with the city, and no one would contend that mandamus would lie to compel the consent, or that any power other than the legislative body of the city could dictate the terms and conditions.
Every public utility owes three duties and obligations : first, not to abfise the streets so as to create a nuisance; second, to provide adequate service and facilities; third, to charge a reasonable rate.
*97 If any of these elements is lacking, there is an omission of duty, pro tanto, and it follows that the city and its citizens are-not receiving their due. If an unreasonable rate is charged, there is a detriment to the consumer just as clearly as though the service or facilities were inadequate. The damage differs only in kind, not in degree. If these premises are true, then the conclusion is irresistible that the city authorities would be remiss in their duty and unfaithful to their trust if they did not carefully safeguard all these three elements, including rates.
We have therefore reached the conclusion that the rate stipulation is upon reason and principle a valid condition to the consent contract. Let us, however, discuss briefly some of the authorities upon this question.
In the state of Michigan the statute is quite similar to Section 9197, General Code, and the adjudication's in that state should therefore be valuable. In the case of Mahan v. Michigan Telephone Co., 132 Mich., 242, on the subject of contracts entered into under favor .of consent provisions, the syllabus contains the following statement: “Although a telephone company has a right to maintain a telephone exchange in a city under reasonable rules and regulations made by the city, yet it may, by accepting an ordinance,,enter into contractual relations with the city, and be bound to perform the terms and conditions of the ordinance.”
It will be seen that in Michigan the telephone companies may use and occupy the streets as a matter of right, the statute merely containing a *98 proviso that consent of the city authorities must first be obtained. In the Ohio statute the consent is a condition precedent to the right to construct underground conduits.
This proposition was again before the Michigan courts in a gas case, entitled Boerth v. Detroit City Gas Co., 152 Mich., 654. In that case the question arose under the city charter of the city of Detroit, which gave the common council the right to control, prescribe and regulate the manner in which the highways and streets within the city should be used and enjoyed. The statute under which the gas company was organized provided that the company should have power to lay pipes or conductors “with the consent of the municipal authorities * * * under such reasonable regulations” as the city may prescribe. Under this state of the law, the court, made the following declaration (18 L. R. A., N. S., 1197): “A municipal corporation has authority to fix by contract the rates which shall be paid by its inhabitants for gas furnished by a public-supply corporation under statutory authority to consent to the laying of the gas main in its streets under such reasonable regulations as it may prescribe.”
In the case of Chas. Simons Sons Co. v. Maryland Telephone & Telegraph Co., 99 Md., 141, the court of appeals of Maryland dealt with a very similar proposition. The statute is as follows: “The Mayor and City Council of Baltimore shall have power to regulate the use of the streets, lanes and alleys in said city by railway or other tracks, gas or other pipes, telegraph, telephone, electric light or other wires and poles,, in, under, over or upon the *99 same, and may require all such wires to be placed under ground, after such reasonable notice as they may prescribe.” The syllabus in that case (63 L. R. A., 727) is:
“The duty to furnish service at specified rates may be imposed by a municipal corporation having statutory authority to regulate the use of its streets by a telephone company.
“A telephone company which accepts the conditions as to rates to be charged by it imposed by a municipal corporation as a condition to its use of the streets for its conduits, cannot complain that the rates are not reasonable.”
In the state of Kentucky the constitution provides that a city may sell franchises at public sale to the highest and best bidder for a term not exceeding twenty years. Pursuant to that constitutional authority it was decided in the case of Moberly v. Richmond Telephone Co., 126 Ky., 369, as follows:
“A city may annex any lawful condition to the exercise of a franchise granted to a public service corporation, which condition becomes a part of the contract under which it is thenceforth used.
“Where a city granted a franchise for the operation of a telephone line, it was competent to provide as a condition that the rates for service to citizens should not exceed a schedule fixed in-the ordinance, or any future ordinance properly adopted.”
In the state of Texas the statute gives telephone and telegraph companies the right to use streets and alleys of municipalities, and such right is absolute except for the limitation that the city authorities may by ordinance specify where posts, piers or *100 abutments shall be located, the kind of posts that shall be used, and the height at which the wires shall be run. Pursuant to this very meager authority given to municipalities it was held in the case of Athens Telephone Co. v. City of Athens, 182 S. W. Rep., 42, that if in a franchise there'is a stipulation providing a maximum charge for telephone rentals, such charge cannot thereafter be raised above such maximum, and that a telephone company voluntarily accepting the rate imposed by a franchise cannot thereafter contest its reasonableness or refuse to furnish service at such rate.
In the case of City of Emporia v. Emporia Telephone Co., 88 Kans., 443, it was. held not only that the provision as to rates would be binding but also that the principle of estoppel applies.
The syllabus of that case is in part as follows:
“The principle of estoppel applicable to a public service corporation claiming that its contract with a city was ultra vires the municipal corporation is considered and applied.
“The rates for telephone charges prescribed in an ordinance adopted and accepted in the year 1900, and agreed to by an assignee ■ of the privileges granted by such ordinance in the year 1905 as a condition of the municipal consent to the transfer, (such consent being necessary under the terms of the ordinance), will govern until action is taken by the state or by its authority.”
In the state of Indiana the statute provides that the common council shall have exclusive power over the streets, highways, alleys and bridges within cities; and the power to establish a rate had not been *101 expressly delegated. Nevertheless, in the case of Muncie Natural Gas Co. v. City of Muncie, 160 Ind., 97, the supreme court held not only .that the municipality can stipulate a maximum rate in a franchise allowing a gas company to lay pipes in the streets, but also held that the gas company, while continuing to use the streets under such franchise-contract, is estopped from claiming that the city has not power to stipulate such rate.
In the state of Pennsylvania the constitution provides that no street passenger railway shall be constructed within the limits of any city, borough or township without the consent of its local authorities. Based upon this constitutional provision, the supreme court of Pennsylvania, in the case of Allegheny v. Millville, Etna & Sharpsburg Street Ry. Co., 159 Pa., 411, held that a municipality, as a condition of its consent, may require that the railway company charge a certain designated fare.
In the state of New York the statutes are similar to Ohio statutes, and it was held in the case of Rochester Telephone Co. v. Ross, 195 N. Y., 429, that an agreement as to rates made as a condition to granting consent was a valid stipulation in the contract.
In addition to the adjudications in courts outside of Ohio there are certain declarations by the supreme court of Ohio which strongly support the view that contracts between municipalities and utilities may contain valid stipulations agreeing upon rates and charges.
In the case of City of Lima v. Public Utilities Commission, 100 Ohio St., 416, the opinion written *102 by Judge Matthias contains, on page 421, the following: “The right to contract for the product or service of a public utility necessarily includes the right and authority to agree on rates and charges. There can be no virtue in the right conferred upon municipalities to contract for the product or service of a public utility company if it is powerless to agree on the rate or price to be paid therefor, or, if, after such agreement is made, and during the period covered by the contract, its terms may be materially altered by the Public Utilities Commission. Aside from the proposition that the right to make such contract is now,conferred by constitutional provision, it is to be borne in mind that the powers of the Public Utilities Commission are conferred by statute and it possesses no authority other than that thus vested in it. The City of Cincinnati v. The Public Utilities Commission, 96 Ohio St., 270; The City of Washington v. The Public Utilities Commission, 99 Ohio St., 70.”
More recently, at the present term of this court, in the case of Link et al. v. Public Utilities Commission, 102 Ohio St., 336, the opinion written by Judge Matthias contains the following, statement, at page 339: “In this instance the city of Cleveland-passed an ordinance fixing the price for steam for heating purposes covering a period of five years. The Cleveland Electric Illuminating Company, in writing, duly accepted the provisions of such ordinance, without condition or reservation. By such unconditional acceptance the utility company agreed to continue to furnish its product and service for the ensuing period of five years at the stipulated *103 rate. A contract between the city and the utility company for its product and service at the stipulated price, and for the period named, was thus made, and is binding upon both parties. City of Cleveland v. Cleveland City Ry. Co., 194 U. S., 517, and Columbus Railway, Power & Light Co. v. City of Columbus et al., 249 U. S., 399.”
If the conclusion is reached in this case that the franchise-contract of 1899 is valid, the doctrine of ultra vires would have no application and it would follow as a'natural sequence that it would not be necessary to invoke the doctrine of estoppel.
On the other hand, let us assume for the purposes of the argument that the contract is invalid, and ultra vires the city of Columbus, and from that standpoint discuss the question as to whether or not under such circumstances The Ohio State Tele-r phone Company is estopped from asserting ultra vires.
This contract was made in 1899, and by virtue of its terms the telephone company acquired valuable rights and has exercised privileges which are presumably of great value to it, for a period of approximately eighteen years, before invoking the power and authority of the Public Utilities Commission. Furthermore the telephone company is still occupying and using the streets and alleys of the city and desires to continue to do so. The relations, powers and duties of the parties are therefore to be measured and determined not upon the theory that the contract is executory, but upon the theory that it is an executed contract, or at least partly executed. It would be impossible for the *104 telephone coftipany to give up and restore to the city the advantages it has enjoyed during the period of approximately twenty years, and it is not even tendering restoration and surrender at this time of the use, occupation and other advantages which, it is enjoying at the present time. Surely the principle of entirety of contract must apply to this case, and it is elementary that one party to a contract, whether entire or divisible, may not invoke the aid of a court for relief from certain conditions and obligations of a contract and at the same time claim the benefits and advantages of other features of the contract: It is well settled that as a general rule the doctrine of estoppel does not preclude the state, and this rule is urged by counsel for the telephone company. It is our view of the matter, however, that although the state through its agency, the Public Utilities Commission, has made the order in this case, the fact remains that the order was made at the request and for the benefit of the telephone company in a controversy in which the city of Columbus and not the state of Ohio is the adversary party. The rule that the doctrine of estoppel cannot be invoked to prevent the state from setting up a claim of ultra vires is equally applicable to municipalities, and if there is any force and effect to be given to the rule it ought therefore to be in favor of the city of Columbus in its contentions in this controversy.
A distinction is properly drawn in the application of the principle of estoppel against setting up the claim of ultra vires between cases in which contracts are contrary to public policy or expressly or im *105 pliedly prohibited by statute and cases where there is a mere defect of power on the part of the municipality to enter into the contract, where in fact the other party has entered' upon the execution of the contract and continues to enjoy its benefits and advantages. In the first class of cases it is settled beyond controversy that the contract is absolutely void and that it cannot be made valid by any subsequent act, but there is a long line of very respectable authorities which hold that in the latter class o„f cases the doctrine of estoppel applies.
In addition to the cases of City of Emporia v. Emporia Telephone Co., 88 Kans., 443, and Muncie Natural Gas Co. v. City of Muncie, 160 Ind., 97, heretofore cited, there are a number of other Indiana authorities, and the same doctrine has been declared in the following cases outside of Ohio: City of Manitowoc v. Manitowoc & Northern Traction Co., 145 Wis., 13, 19; Jersey City v. North Jersey St. Ry. Co., 72 N. J. L., 383, 391; State, ex rel. Borough Rutherford, v. Hudson River Traction Co., 73 N. J. L., 227, 235; Chicago General Ry. Co. v. City of Chicago, 176 Ill., 253, 259; People, ex rel. Jackson, v. Suburban Rd. Co., 178 Ill., 594, 607, and City of St. Louis v. Davidson, 102 Mo., 149.
This question has received some attention at the hands of this court in several cases in which the situation is sufficiently similar to make the declarations therein found of some value. In the case of Farmer v. Columbiana County Telephone Co., 72 Ohio St., 526, it was held that estoppel could not be invoked, but it was particularly stated in that case as the reason for so holding that the agreement which *106 had been made between the municipality and the telephone company was one in which the telephone company had received no consideration whatever for its promise. Under the law the telephone company had the right to use the streets and alleys of municipal corporations for overhead construction without the necessity of obtaining the consent of such municipality, and therefore the attempt of the city to impose conditions as to rates was wholly without force or effect. The court therefore held that there was no contract. In the opinion at page 532, the court made the following declaration: “It follows from what has preceded that the municipality possessed nothing in the way of a valuable right to bestow upon the Company. Hence the promises of the Company to do what it was not, and could not by the city be required'to do, was a naked promise, without consideration. • It therefore fails as a contract, and it is difficult to see how Farmer & Getz could take advantage of a nude pact to raise an estoppel, a pact to which they were in no wise parties, or privies in the eye of the law, and against a party with whom they had no contract or other legal relations whatever themselves.”
The above-quoted declaration and other declarations found in.the opinion clearly show that the court was basing its conclusion entirely upon the fact that there was no contract, and it fairly follows conversely that if there had been a mutual contract based upon a proper consideration a different conclusion would have been reached.
The later decisions of this court, however, throw further light upon this proposition. In the case of *107 Interurban Ry. & Terminal Co. v. City of Cincinnati, 93 Ohio St., 108, we find in the syllabus the following significant language: “The acceptance of the grant by the company constituted a binding contract between the parties. As, long as the company retains the franchise and operates its road thereunder its terms must control.”
The language of the above-quoted syllabus is adopted and carried into the first paragraph of the syllabus in the case of Interurban Ry. & Terminal Co. v. Public Utilities Commission, 98 Ohio St., 287. While the word “estoppel” does not appear either in the syllabus or in the opinion in either of these cases, that part of the language which we have emphasized and italicized clearly states the principle of estoppel. The doctrine of ultra vires has its foundation in public policy and its chief value consists in being a brake upon improper corporate action, to be enforced while the contract is still executory. But in the instant case the parties have proceeded too far under the contract, and have received and are still holding too many benefits and advantages under the contract, without making any effort toward reimbursement or restoration or surrender of those benefits and advantages, to be permitted to invoke the benefits of the doctrine at this time.
If the state has conferred upon the municipality the power to make a valid contract, including the stipulation of a rate, and if pursuant to such power so given a contract has been made in which a rate has been stipulated, and no review thereof under favor of Section 614-44 is authorized, then the state *108 has lost the power to revoke or revise such rate, because the obligation of the contract and the rate therein established are inviolable under the guaranty of both State and Federal Constitutions, Section 28, Article II of the State Constitution, and Section 10, Article I of the Federal Constitution.
If on the other hand it be conceded for the sake of argument that a rate-contract 'made under legislative authority may afterwards be regulated by an. agency created and empowered by legislative enactment, it becomes important to ascertain whether the agency (the Public Utilities Commission) has acted under specific authority of statute.
It is claimed that the state has acted through the agency of the Public Utilities Commission. It then becomes necessary to inquire into the powers of the commission.
It has been decided several times that the commission is a creature of the statute and.that it has no authority except such as is invested in it by statute. (Interurban Ry. & Terminal Co. v. Public Utilities Commission, supra, and City of Cincinnati v. Public Utilities Commission, 96 Ohio St., 270.) We must therefore look to the statutes to ascertain whether express power has been given to abrogate the rate-contract between the city of Columbus and The Ohio State Telephone Company.
The powers conferred by statute upon the Public Utilities Commission are in the most general terms, and the only specific provisions contained therein, giving the right to terminate existing contracts, are found in Section 614-19, General Code, which apply only to contracts for an indeterminate period, or *109 those which by their terms may be terminated by notice.
That section cannot, therefore, apply, because the franchise of 1899 runs twenty-five years and is not terminable by notice.
It is claimed by counsel for the telephone company that authority for regulation of this contract is found in Section 614-47, General Code. This section reads as follows:
“This act shall not apply to any rate, fare or regulation now or hereafter prescribed by any municipal corporation granting a right, permission, authority or franchise, to use its streets, alleys, avenues or public places, for street railway or street railroad purposes, or to any prices so fixed under sections 3644, 3982 and 3983 of the General Code, except as provided in sections 46, 47 and 48 [G. C. §§ 614-44, 614-45 and 614-46] of this act.”
It is argued that since the foregoing section provides that the act shall not apply to certain rates prescribed by municipal corporations, therefore, by virtue of the maxim expressio unius est exclusio alterius, it does not apply to all rates prescribed by municipal corporations other than those therein mentioned.
Section 614-47 cannot aid unless by its express terms the power is clearly conferred to revise and regulate' a compulsory municipal rate. To, invoke the aid of the maxim is to admit that the authority is not express, but is only implied, if it exists at all..
It is further claimed, however, because severál companies were merged in 1914, and because the consolidation required the approval of the commis *110 sion by virtue of Section 614-61, General Code, and because the further provisions of Section 614-61 authorize the commission to regulate and determine the rate to be charged by such. consolidated company, and because in this instance the commission did in fact determine the rate thereafter to be charged, that authority for changing the rate is found in Section 614-61, General Code.
There are several good and sufficient answers to this proposition. In the first place the city of Columbus was not a party to the consolidation proceedings, and while the commission might make binding and enforceable orders upon the telephone companies as a condition to granting authority to consolidate, it could have no power to make any order against the city of Columbus which would- not be acceptable or agreeable to it. In the second place, if the commission had special power in the matter of imposing rates upon telephone companies, as a condition to approval of the proposed merger, it seems that the power was exercised and the commission in fact did determine that the contract rates theretofore established should be the rates thereafter to be charged.
We do not hold that the órder of the commission fixing the rate at the time the consolidation was approved exhausted its power over rates. Our holding is that it did not have the power to revise and regulate a contract.
If the rates fixed by contract in 1899 had proved to be exorbitant in 1914, the commission might have so ascertained and might have required a reduction as a condition to granting approval of the merger, *111 because the telephone companies were submitting themselves to the jurisdiction; but it does not follow that the city of Columbus would be bound to submit to an increase, because it was not a suppliant.
We are therefore forced to conclude that the provisions of Section 614-61 do not aid the telephone company.
The language of the court of appeals of New York in the case of In re Quinby v. Public Service Commission, 223 N. Y., 244, 263, is applicable:
“In the absence of clear and definite language conferring without ambiguity jurisdiction upon the public service commission to increase rates of fare agreed upon by the street railroad and the local authorities we should not unnecessarily hold that the legislature has intended to delegate any of its powers in the matter, whatever its powers may be. The Public Service Commissions Law (§ 26, §49, subd. 1) and the Railroad Law (§181) deal with maximum rates of fare established by statute but make no reference in terms to rates established by agreement with local authorities.
“In regulating rates three courses were open to the legislature:
“1. To prescribe rates itself. 2. To delegate the power to the Commission. 3. To leave the matter to agreement between • the street railroad company and the local authorities. It has constitutionally conferred on the public service commission certain functions (Matter of Trustees of Village of Saratoga Springs v. Saratoga Gas, E. L. & P. Co., 191 N. Y. 123), which plainly include the power to regulate rates fixed by statute, and while it may be *112 said that it has undertaken to delegate to the public service commission ‘the same power’ that it has to regulate rates of fare (Railroad Law, § 181) it is impossible to find a word in the statutes which discloses the legislative intent to deal with the matter of rates fixed by agreement with local authorities.”
The law of the state of New York and the facts of that case to which the law was applicable are so parallel to the law of the state of Ohio and the facts of the instant case to which the same is applicable that the foregoing pronouncement of the court of appeals of New York, if sound, must be decisive of the instant case. Counsel for the telephone company have evidently seen the matter in this light and have endeavored to show that the court of appeals of the state of New York in the case of People, ex rel. Village of South Glens Falls, v. Public Service Commission, 225 N. Y., 216, has either overruled that case or so far distinguished it as to render it of little value. We have therefore carefully examined the later New York case and find that Justice Crane in rendering the principal majority opinion has stated very definitely that the case is not inconsistent or contrary to the principles declared in the Quinby case and has so clearly distinguished the two' cases as to show that the latter was not intended in any sense to overrule the declarations of the former. Justice McLaughlin in a concurring opinion reached the same conclusion and at great length points out the distinctions and the lack of conflict.
It is further claimed by the telephone company that the order of the commission in this case is valid *113 because it was made as an emergency order under authority of Section 614-32, General Code. The only emergency shown to exist, however, is a pending proceeding to revise and regulate rates, and a claim that due to increased costs the former rate was inadequate.
The section provides that this emergency power shall exist when deemed by the commission “necessary to prevent injury to the business or interests of the public or any public utility,” and that its action shall be temporary. The commission is to judge the' emergency, but its judgment will be reversed on review if “unreasonable and unlawful.” Surely, even if the business of the utility is temporarily conducted at a loss, no emergency is presented, any more than if, due to a business depression, the cost of furnishing service would be greatly reduced making the rate a very profitable one for the time being. We have no hesitation in holding that such situations are not emergencies.
The greatest objection to Section 614-32 is that like Section 614-23 it is general in its terms and not specifically made applicable to rates made by voluntary contract.
It is not even suggested that any other provisions of the public utilities laws have any bearing upon the matter.
Our conclusion therefore is that no express power has been conferred by statute upon the commission in clear and definite language to increase the rates fixed by contract, and that whatever the powers of *114 the'state may be they have not been delegated to the Public Utilities Commission.
This view is supported by this court in the case of Interurban Ry. & Terminal Co. v. Public Utilities Commission, 98 Ohio St., 287, from which we quote, page 299: “Moreover, we are not able to find that the legislature has attempted to confer upon the public utilities commission the authority to change rates fixed by contract between the company and local authorities.”
Again, from page 302, we quote: “The general, assembly not having provided that the commission may interfere with valid and binding contracts, we may well conclude that it excluded them from consideration.”
While that case involved a franchise-contract with an interurban railway company, and while the provisions of the statute conferring power upon the municipality to make contracts with interurban railroad companies and to fix terms and conditions of the grant are much-more comprehensive than the provisions of Section 9197, General Code, nevertheless we have reached the conclusion that this is a valid and binding contract and the declarations of this court in that case therefore have equal force in the instant case.
Reference has been made by counsel on both sides to several decisions of the supreme court' of the United States. We think a careful examination of those cases will disclose that the aupreme court of the United States has not a.t any time made any declarations which would destroy voluntary contracts fairly entered into.
*115 In the case of City of Cleveland v. Cleveland City Ry. Co., 194 U. S., 517, the principle of the inviolability of such contracts is clearly recognized.
The case of Puget Sound Traction, Light & Power Co. v. Reynolds, 244 U. S., 574, has been cited and Commented upon by counsel for the telephone company. But an examination of that case and of the constitution and statutes of the state of Washington shows that the provisions of the constitution and statutes of that state have an important bearing upon the decision. The constitution permits certain cities to frame charters for their own government, but further provides that such charters must be “consistent with and subject to the constitution and laws of this state.” The charters are therefore made specially subject to legislative authority, and based upon this provision there was no difficulty in holding that the public utilities act would supersede any ordinance or charter provision of any city which would come in conflict with state laws. The dissimilarity of the Ohio Constitution makes that case without value as an authority.
In the case of Walla Walla City v. Walla Walla Water Co., 172 U. S., 1, it was held that the grant by the municipality to fhe water company of the right to lay pipes and mains in the streets upon certain stipulated conditions was a contract which was protected by the federal constitution against impairment of its obligations. It was held that all contracts entered into between municipalities and others are valid and immune against any law or state constitution impairing their obligations, unless *116 such contracts are “prejudicial to the peace, good order, health or morals of its inhabitants.”
In that case the court further states that the rulings of the court that a city council cannot bind itself nor its successors to contracts are confined to cases of that class.
It cannot possibly be claimed that the contract between the city of Columbus and the telephone company contains anything prejudicial to the peace, good order, health or morals of the community, and the conclusion is therefore reached that the declarations of the supreme court of the United States do not justify the supervision, regulation or termination of the contract.
From all the foregoing discussion of principles and authorities we conclude that although by the provisions of Section 9197, General Code, definite and specific power was not given to prescribe -by compulsion a telephone rate, nevertheless the consent provision of that section necessarily implies the power to contract for a rate and that the legislature has not in definite and specific terms conferred upon the Public Utilities Commission the power to supervise, regulate or terminate such contract.
The franchise-contract .was made in 1899 and’ must be construed and enforced according to the standard of laws in force at that time. Laws existing in 1899 are read into and become a part of the contract. But this is not true of laws enacted thereafter. The public utilities act was not enacted until May 31, 1911. Even if the provisions of the act were broad enough and specific enough to clearly *117 empower the commission to revise and regulate the rates in the contract of 1899, upon what principle would such provisions be valid? For aught that appears the contract was fairly entered into. The telephone company has received its “quid,” the city of Columbus must receive its “quo.” Why should the telephone company be permitted to exercise its franchise to the end of the term and yet be relieved from the obligation of the most important consideration which moved the city to grant the franchise, and except for which the city might have withheld its consent altogether? Upon this point we quote from the opinion in Interurban Ry. & Terminal Co. v. Public Utilities Commission, supra, at page 302. Referring to the consents of abutting property owners as a condition to municipal grant of railway franchise it is said: “The presumption is that such consents are given in consideration of the terms of the grant to be complied with by the company, including the rate of fare agreed on. It would not only be a vain and empty arrangement, but a deceptive one, if these provisions could be disregarded and the company nevertheless retain and exercise all of the valuable rights and privileges granted to it in consideration thereof.”
Reference has been made by counsel on both sides to the constitutional amendments of 1912, known as the home-rule amendments. In the view we have taken of this matter the home-rule provisions need not be invoked. Neither do we think they have any bearing upon the matter. If, on the other hand, it is contended that the public utilities act of May 31, 1911, can affect a contract entered into in 1899, *118 then it would seem that a constitutional provision adopted in 1912 ought to have at least as much effect as the statute of 1911. It will of course not be disputed that if the franchise-contract had been entered into after January 1, 1913, there would be no cause for controversy. In our view of the case, the only effect the home-rule amendments can have upon a contract theretofore entered into is to indicate the policy of the state.
Much of the difference of opinion between counsel arises from the fact that counsel for the telephone companies treat this contract as an effort to fix, or impose, or prescribe by compulsory process a rate to the telephone companies, while we think the correct view is that maintained by counsel for the city, that the contract was voluntary.
While we have examined every .authority cited in the exhaustive and voluminous briefs of counsel, we cannot discuss all of them within the reasonable compass of this opinion. We believe the principles herein declared are controlling and that nearly all of the cases cited can be either distinguished or reconciled.
We therefore hold that the city had the power to give or withhold its consent to the use of its streets for underground conduits; that as one of the conditions to such consent it might stipulate a maximum rate for a period of twenty-five years; that such a stipulation was agreed to by the telephone company and observed by it without objection for approximately eighteen years; that the contract in which consent was given subject to the condition that the maximum rate therein named *119 would be observed was valid; and that its obligations may not be impaired.